## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| ESTATE OF GARY W. PINGREE, UEALENE M.<br>PINGREE, individually and as Administrator, KIM<br>PINGREE MARTIN and PAM PINGREE PEAK, | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) |  |
|  | ) | No. 05-2173-KHV |
| TRIPLE T FOODS, INC., KURT TERLIP and<br>PRINCIPAL LIFE INSURANCE COMPANY, | ) ) |  |
|  | ) |  |
| Defendants. | ) |  |
| _____ | ) |  |

### MEMORANDUM AND ORDER

Gary W. Pingree died in a car accident on December 4, 2001.  His estate, his wife and his two

daughters thereafter filed suit to recover life insurance proceeds and damages from his former employer

Triple T Foods, Inc. ("TTF"); Kurt Terlip, a part owner of TTF; and Principal Life Insurance Company

("Principal"), the insurer for TTF group life insurance policies.  Plaintiffs claim violations of the Employee

Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), retaliatory discharge, breach of

contract and breach of fiduciary duty.  At the status conference on March 16, 2006, the parties agreed to

a bench trial, on a written record, of plaintiffs' claim against Principal for denial of life insurance benefits.

Under that agreement, the record with regard to Defendant Principal Life Insurance Company's Motion

For Summary Judgment (Doc. #45) constitutes the record before the Court.  Based on that record, the

Court finds that Principal is entitled to judgment and makes the following findings of fact and conclusions

of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

**Findings Of Fact**

On December 4, 2001, Gary Pingree, the husband of Uealene Pingree, died in an automobile accident. The Pingrees had two daughters – Kim Pingree Martin and Pam Pingree Peak.

**I.     Mr. Pingree's Employment At TTF Before September 4, 2001**

Triple T Foods, Inc., a Kansas corporation in the pet food business, employed Mr. Pingree from 1990 to September 4, 2001. Kurt Terlip and Chris Terlip, who are brothers, each own 50 per cent of the TTF stock. On September 4, 2001, Kurt Terlip was president of TTF, Chris Terlip was vice president and Mr. Pingree was chief financial officer ("CFO"), secretary and treasurer. These three individuals also comprised the board of directors.

In January of 2001, Mr. Pingree gave Chris Terlip notice of a board meeting to vote on a potential sale of TTF's dog food manufacturing facility in Frontenac, Kansas. Chris Terlip looked at the notice and told Mr. Pingree, "You do this and I will fire your ass." He also told Kurt Terlip and Mr. Pingree that voting for such a sale would violate their fiduciary duties to the corporation. In reliance on a written opinion by TTF corporate counsel, however, Kurt Terlip and Mr. Pingree believed that it was in TTF's best interest to sell the facility. At the board meeting on January 31, 2001, over Chris Terlip's objection, they voted to do so.[1]

On March 19, 2001, Chris Terlip and Kurt Terlip executed an agreement and proxy pertaining to the sale of TTF's "Natural Life" brand name. See Administrative Record ("AR") 500, attached as Exhibit B to Memorandum In Support Of Defendant Principal Life Insurance Company's Motion For

---

[1]     The sale of the facility required only a majority vote and no vote of shareholders was required.

Summary Judgment (Doc. #46) filed December 19, 2005.  They both agreed to vote for the sale to

Grasshopper Packing Company, a limited liability company set up by Chris Terlip, and to terminate Mr.

Pingree's employment before July 15, 2001.  Id.  The agreement provided in part as follows:

> If Mr. Pingree has not been terminated by July 15, 2001, then Chris Terlip and Kurt Terlip hereby grant the other his irrevokable [sic] proxy, as shareholder, officer and director, to specifically and solely so terminate, effective on or after July 15, 2001, Mr. Gary Pingree as an officer, director, employee, consultant, contractor and in all other capacities from Triple T Foods, Inc.

Id.

On May 31, 2001, TTF terminated its agreement to sell the dog food facility because the buyer

could not obtain adequate funding.  Kurt Terlip and Mr. Pingree later found another purchaser and at a

meeting on July 5, 2001, they again voted to sell the facility over Chris Terlip's objection.

## II.     Principal Life Insurance Policies For TTF Officers And Supervisors

As an employee benefit, TTF purchased group life insurance from Principal – one policy for eligible

officers and another policy for eligible supervisors of the company.  Except for the benefit amount, the

Officer and Supervisor policies have identical terms.  Both policies provide that individual coverage

terminates on the earliest of "the end of the Insurance Month in which the Member ceases to be a Member

as defined in PART I; or . . . the end of the Insurance Month in which the Member ceases Active Work."

See Part III, Section C, Article 1; AR 108, 362.

Both policies provide that in order to be eligible, an individual must be a "full-time employee,"

defined as follows:

> any person regularly scheduled to work for the Policyholder for at least 30 hours a week. Work must be at the Policyholder's usual place or places of business or at another place to which an employee must travel to perform his or her regular duties.

Part I - Definitions; AR 94, 348.  Both policies defined "active work" and "actively at work" as the "active performance of all of a Member's normal job duties at the Policyholder's usual place or places of business."  Id.  The actively at work requirement is waived for members who are absent because of a regularly scheduled day off, holiday or vacation day.  Section B, Article 1; AR 104.

Under both policies, a member qualifies to purchase an individual policy if group insurance terminates because the member ends active work.  Section F, Article 1(b)(1).  Both policies contain a 31-day grace period after a participant is last employed to convert the group life insurance policy to an individual policy.  Accordingly, if a participant dies within the 31-day grace period, the actively at work requirement is waived and the participant's beneficiaries may collect on the policy.  Both policies state that "[n]otice of the individual purchase right must be given to the Member by the Policyholder before insurance under th[e] Group Policy terminates, or as soon as reasonably possible thereafter."  Section F, Article 1(c). Based on this language, Principal has discretion regarding when an individual can exercise the purchase right.  Where a former employee has not received notice of the right to purchase an individual policy, Principal does not necessarily deny the claim if he or she dies after the 31-day period.  On the other hand, Principal's corporate representative could not think of an instance where Principal had allowed such a claim.

Under both policies, Principal has complete discretion to construe and interpret the policies and determine eligibility for benefits.  See Part II, Article 9; AR 98, 352.

### III.   Mr. Pingree's Employment Status After September 4, 2001

On September 4, 2001, to thwart the impending sale of the dog food facility by creating a board deadlock on the issue, Chris Terlip informed Mr. Pingree that he was terminated from all positions with TTF.[2]  See Chris Terlip Depo. at 49.  Chris Terlip met with Kurt Terlip on September 4, 2001, shortly before he met with Mr. Pingree.  See id. at 79-80.  Chris Terlip gave Mr. Pingree a letter which stated that (1) pursuant to the unanimous written consent of the shareholders, he was terminated as a member of the board of directors and (2) pursuant to the unanimous written consent of the board of directors, he was terminated as an officer, employee, agent or consultant of the company.  AR 1072.  Chris Terlip signed the letter, ostensibly as president of TTF and on behalf of all shareholders and directors of TTF.  Chris Terlip Depo. at 74.[3]  Immediately thereafter, security personnel retained by Chris Terlip escorted Mr. Pingree from the premises.[4]  Kurt Terlip testified that he let his brother fire Mr. Pingree and that his brother had authority to do so because he had given him such authority.  Kurt Terlip Depo. at 30, 33.

Mrs. Pingree testified that her husband told her that Chris Terlip had terminated him, but that he

---

[2]   Attorneys for Chris Terlip had advised him that as TTF president, he had the power to terminate Mr. Pingree's employment.  AR 1071.

[3]   Under TTF bylaws, because Chris Terlip was vice president (not president) of TTF and no board meeting was held on the issue, Chris Terlip may not have had actual authority to terminate Mr. Pingree's position as an officer of TTF.  Likewise, Chris Terlip may not have had authority to terminate Mr. Pingree as a director because no shareholder meeting had been held on the issue.  The agreement of March 19, 2001 between Chris Terlip and Kurt Terlip regarding the termination of Mr. Pingree's employment was not filed with Mr. Pingree, the secretary of TTF.  The bylaws required such a filing to formalize shareholder action without a meeting.

[4]   The security personnel did not allow Mr. Pingree to remove anything from his office.  Shortly after September 4, 2001, Kurt Terlip gave Mr. Pingree two boxes of pictures and other personal possessions from his office.  See Uealene Pingree Depo. at 48.

was going to do consulting work for Kurt Terlip and Bob Terlip (the father of Kurt Terlip and Chris Terlip), and that Kurt Terlip had promised to maintain life and health insurance benefits for him.  See Uealene Pingree Depo. at 124.  Bob Terlip testified that some time on September 4, 2001, Mr. Pingree went to his house and told him that he had been fired.  See Robert Terlip Depo. at 12-14.  Later that evening, Mr. and Mrs. Pingree went to the home of Kurt Terlip.  Mrs. Pingree testified that Kurt Terlip told them that Mr. Pingree would work with him and Bob on accounting, "his investments and whatever."  Uealene Pingree Depo. at 35; see AR 17.  Mrs. Pingree testified that Kurt Terlip reassured them that he would keep Mr. Pingree's health and life insurance benefits, and that he repeated this assurance six or seven times.  Uealene Pingree Depo. at 53.  Kurt Terlip admits that he met with the Pingrees, but denies that he promised to continue Mr. Pingree's benefits.  Kurt Terlip Depo. at 35-36.  Kim Terlip, the wife of Kurt Terlip, recalls that during that evening, after Mr. Pingree had expressed financial concerns, Kurt Terlip put his arm around Mr. Pingree and said that he would take care of him.  Affidavit of Kimbra D. Terlip ¶¶ 3-4, AR 1317.

On or shortly after September 4, 2001, Mr. Pingree called Ted McKnight, a representative of CBIZ Benefits and Insurance Services ("CBIZ"), which provided insurance and employment services to TTF.[5]  McKnight testified that Mr. Pingree said that his employment at TTF had been terminated.  See McKnight Depo. at 17.  Shortly after the call, McKnight called Kurt Terlip and told him that he just learned that Mr. Pingree's employment had been terminated.  McKnight testified that he asked Kurt Terlip about

---

[5]     In 2001, CBIZ was broker for the TTF health insurance and 401(k) plans.  See McKnight Depo. at 64.  CBIZ did not handle TTF group life insurance benefits (including the Principal policy), but McKnight handled separate life insurance policies from BMA for key TTF employees including Mr. Pingree.  McKnight Depo. at 85-87.  The BMA life insurance policy for Mr. Pingree was in place at the time of his death and the premiums had been paid by either Mr. Pingree or TTF.  Id. at 90-91.  Mrs. Pingree received the proceeds of that policy shortly after her husband's death.

sending a COBRA notice to Mr. Pingree, but Kurt Terlip told him to "just hold on" and leave things as they were.  <u>See id.</u> at 18-19, 55, 84.  McKnight therefore understood that Mr. Pingree's benefits would remain in place.[6]  <u>See id.</u>  McKnight testified that Kurt Terlip told him that Mr. Pingree was still doing consulting work, but Kurt Terlip did not specify whether it was for TTF or for him personally.  <u>See</u> McKnight Depo. at 79.  Kurt Terlip denies that he told McKnight that Mr. Pingree was performing accounting and/or consulting work after September 4, 2001.  <u>See</u> Kurt Terlip Depo. at 80.  After September 4, 2001, Mr. Pingree continued to use a company car, a company cell phone and a company credit card.  Mr. Pingree told McKnight that he thought that TTF had terminated him because of his vote on the dog food facility. McKnight Depo. at 38.

McKnight testified that Mr. Pingree told him that he was still doing some work for the Terlips.  <u>See</u> <u>id.</u> at 73-75.  McKnight understood that Mr. Pingree "was still continuing to work in some capacity" and that he assisted in preparing some tax returns for the Terlips.  McKnight did not testify, however, that such work was for TTF.  <u>Id.</u> at 21, 36, 71-72.  McKnight testified that he later received information from Kurt Terlip that Mr. Pingree was continuing to provide some consulting services to TTF.  The documents which Kurt Terlip provided, however, indicated that Mr. Pingree was doing estate planning consultant work for *Kurt Terlip*.  <u>See</u> <u>id.</u> at 36-37.

When an individual's employment was terminated, TTF policy required that a COBRA notice be sent within one week.  Chris Terlip's attorney put together a list of things to do with regard to Mr. Pingree's

---

[6]        Kurt Terlip denies that he discussed a COBRA notice with McKnight.  <u>See</u> Kurt Terlip Depo. at 39, 70-71.  Kurt Terlip also denies that he told McKnight that he would keep Mr. Pingree's benefits in place.  <u>Id.</u>

termination.  Chris Terlip gave the list to Kurt Terlip and the TTF accounting firm, Baird, Kurtz and Dobson ("BKD").  The list stated that "COBRA information and documents, including medical, dental, life, and disability must be given to Mr. Pingree and he must sign a receipt for it. The same information should also be mailed to Gary's house certified return receipt requested."  No one sent Mr. Pingree any COBRA notice, however, or any notice of his right to continue coverage under the group life insurance policy.[7] Chris Terlip could not explain why no one did so.  Kurt Terlip testified that he saw the attorney's list within days after Mr. Pingree was terminated, but he did not think that his brother expected him to follow up on the items on that list.  Based on the list, Kurt Terlip expected that BKD would send Mr. Pingree a COBRA notice.  See Kurt Terlip Depo. at 90-91.

The Pingrees owned a Roto-Rooter business, but Mrs. Pingree testified that her husband's involvement in that business did not increase after September 4, 2001.  She also testified that after September 4, 2001, Kurt Terlip and Bob Terlip employed her husband.  Uealene Pingree Depo. at 24, 35.[8]  Mrs. Pingree testified that after September 4, 2001, her husband worked for Kurt Terlip during the early morning hours at home – sometimes as early as 3:00 a.m., evenings and usually Sundays.  She did not know what kind of work he was doing, however, or for whom.  Id. at 39-40, 108, 134.[9]  Mrs. Pingree testified that her husband worked several hours a day in the early morning or evening.  Id. at 55.

---

[7]     Before TTF terminated his employment, Mr. Pingree was responsible for COBRA notices at TTF.  See McKnight Depo. at 85.

[8]     Mrs. Pingree did not testify how often her husband met with Kurt Terlip, but Kurt Terlip testified that he went out to Mr. Pingree's house on only two occasions in the three months between September 4 and December 4, 2001.  See Kurt Terlip Depo. at 43.

[9]     Bob Terlip, TTF founder and president until 1998, testified that while he was president, Mr. Pingree sometimes worked at home.

Mrs. Pingree testified that she thought that Kurt Terlip, Chris Terlip and/or Bob Terlip were the same as TTF, but that her husband would have understood the distinction between contracting with one of them personally and contracting with TTF as a company. Id. at 37, 51-52; see McKnight Depo. at 76, 93, 97-98 (TTF and Terlips are one and same; people have difficult time distinguishing TTF and Terlips). Kurt Terlip admitted that both he and Mr. Pingree expected Mr. Pingree to be paid for the services which he provided, but he claimed Mr. Pingree died before they could agree on specific compensation.[10] Mrs. Pingree testified that Bob Terlip delivered cash payments to her husband every Friday after September 4, 2001. McKnight did not know of any cash payments to Mr. Pingree by Bob Terlip or Kurt Terlip. McKnight Depo. at 54, 102. Bob Terlip testified that he only saw Mr. Pingree two or three times in the three months before his death. See Robert Terlip Depo. at 35-36, 56. Except for a loan in the amount of $1,000, Bob Terlip denied giving money to Mr. Pingree. Id. at 21.

As half owner of TTF, Kurt Terlip received approximately $3,000,000 from the sale of the "Natural Life" brand in the spring of 2001. In the summer of 2001, Kurt Terlip asked Mr. Pingree to provide a second opinion on certain investment options for the sale proceeds. Mr. Pingree continued to provide this advice after September of 2001. Kurt Terlip Depo. at 15-16.

In September of 2001, after TTF terminated Mr. Pingree's employment, BKD helped TTF get its books in order. Little Depo. at 16. On November 1, 2001, TTF hired Sara Little as its controller. Little testified that when she was hired, she understood that Mr. Pingree had a company car, id. at 20, and that

---

[10]     Kurt Terlip testified that after September 4, 2001, he told Mr. Pingree that he would compensate him after he set up Terlip Investments. See Kurt Terlip Depo. at 41-42. Kurt Terlip testified that he never discussed a specific amount of compensation. Id.

through December 1, 2001, TTF paid all life insurance premiums for Mr. Pingree. TTF knew and approved of these payments. It also paid insurance premiums for several other non-employees, and starting in January of 2002, Little took care of correcting this. Id. at 49-50. Little testified that Mr. Pingree last received 401(k) contributions in September of 2001, and that he received no compensation in October of 2001. Id. at 43. Little also testified that on the October statement for the BMA life insurance policy, she noted that Mr. Pingree had been terminated on September 4, 2001. Id. at 15-16.

Kurt Terlip testified that TTF operated with only two directors from September 4, 2001 until January or February of 2002. Kurt Terlip Depo. at 147-48.

**IV.     Death Of Mr. Pingree And Principal Investigation Of Life Insurance Claim**

As noted, Mr. Pingree died in a car accident on December 4, 2001. Terri Strand, who was Chris Terlip's secretary, performed bookkeeping functions for TTF. Strand testified that at Mr. Pingree's funeral, she probably told Kevin Williams, a former BKD accountant, that she "did not know what she was going to do now that Gary was gone, because he was helping [her] with accounting work." Immediately after Strand so testified, she added, "I mean, I don't know that I said that." Strand Depo. at 24-25.

Mrs. Pingree testified that within a week after her husband's death, Kurt Terlip went to their house and removed three or four boxes of documents, including TTF files and files for Kurt Terlip's personal business which Mr. Pingree had kept separate from TTF files. Uealene Pingree Depo. at 15, 21-22. Kurt Terlip denies picking up any files or boxes from the Pingree house. See Kurt Terlip Depo. at 81.

Shortly after Mr. Pingree died, Kurt Terlip asked McKnight to take care of the BMA life insurance policy on Mr. Pingree and to see what needed to be done for the family to collect on the Principal policy. McKnight Depo. at 20, 24, 25; Kurt Terlip Depo. at 71-72. Kurt Terlip testified that if Mr. Pingree was

covered under the Principal policy, he wanted to help recover the proceeds for the Pingree family.  Id. at 78.

A few weeks after Mr. Pingree died, Kurt Terlip and McKnight delivered to Mrs. Pingree the check on the BMA policy.  Uealene Pingree Depo. at 90.  Kurt Terlip told Mrs. Pingree that she also needed to collect under the Principal policy, which she did not know about until that time.  Id.

On January 8, 2002, Principal received a claim form for life insurance benefits for Mr. Pingree.  Kurt Terlip and McKnight completed a portion of the claim form regarding "Information from the Group Planholder."  In the field for "Date member was last actively at work," they stated "9-01."  Where the claim form asked for "Reason member ceased active work," however, the box for "death" was checked.  The claim form listed the "date of death" as December 4, 2001.

On January 10, 2002, Anne Mullins, a Principal representative, contacted Kurt Terlip to clarify the discrepancy between the September 1 and December 4 dates on the claim form.  Kurt Terlip responded that Mr. Pingree was dismissed in September of 2001.  AR 5.  Kurt Terlip told Mullins, however, that he continued to pay premiums through the date of Mr. Pingree's death.  Kurt Terlip asked if this would be a problem and Mullins told him that she would review the policy language.

On January 31, 2002, Kurt Terlip sent McKnight a confidential memo which indicated that Terri Strand, "at the office up town" had received a fax from Principal.  Kurt Terlip was irritated that Principal was not paying the policy and that it was communicating about the issue with Strand.  Kurt Terlip told McKnight that "nothing should be going to Terri Strand."  McKnight Depo. at 44-45.

On February 1, 2002, Diane Nelson of Principal called Kurt Terlip.  Kurt Terlip confirmed that TTF had terminated Mr. Pingree's employment on September 1, 2001.  AR 7.  Nelson informed Kurt

Terlip that Mr. Pingree's coverage apparently would have terminated at the end of the month in which he ceased work, and that she would be recommending that Principal deny the claim.  Id.  Kurt Terlip told Nelson that he had paid premiums on policy in good faith and that he would do everything in his power to fight a denial.[11]  When Nelson asked Kurt Terlip why he continued to pay premiums, he stated that he had done so because Mr. Pingree was an officer of the company.  AR 8.  Nelson confirmed with Kurt Terlip that Mr. Pingree had ceased work as CFO in September of 2001.  Id.  Kurt Terlip asked Nelson to contact McKnight for further information.  Id.

Later on February 1, 2002, Nelson called McKnight.  McKnight confirmed that in September of 2001, Mr. Pingree was no longer a CFO or officer for TTF, but that he had continued to work as an "accounting consultant" and most definitely was working for the company.  AR 9-10.  McKnight stated that Mr. Pingree was a supervisory employee and that he worked six hours a day and was on call 24 hours a day.  Id.  McKnight told Nelson that he would follow up with Kurt Terlip.  After the telephone conference, Nelson sought guidance from a more senior level claims representative, who advised her to request additional evidence that Mr. Pingree was indeed working from September 4, 2001 to the date of his death.

On February 5 and 8, 2002, Nelson left messages asking McKnight to get a notarized statement from a co-worker of Mr. Pingree stating that he was actively at work as an accounting consultant during October, November and December of 2001.

---

[11]     Kurt Terlip later testified that TTF had paid Mr. Pingree's health insurance premiums after September 4, 2001 by mistake or oversight.  See Kurt Terlip Depo. at 37, 70, 76.  McKnight testified that Kurt Terlip had never told him of this fact.  McKnight Depo. at 56.

On February 15, 2002, Nelson received a message from McKnight, indicating that Kurt Terlip was angry and confused about the request for employee statements, that Kurt Terlip did not think that he should have to involve other employees in the matter and that Kurt Terlip had stated that the premium on Mr. Pingree had continued to be paid. AR 16. That same day, Nelson contacted Mrs. Pingree, inquiring whether she knew how often or when her husband worked as an accounting consultant for TTF. Mrs. Pingree stated that she had no idea. AR 17. Mrs. Pingree told Nelson that her husband worked for Bob Terlip during the day and Kurt Terlip during the evening. Id. Mrs. Pingree told Nelson that her husband did not work for Roto-Rooter. Later on February 15, 2002, Nelson asked McKnight to obtain TTF payroll records for Mr. Pingree from September 1 through December 4, 2001. AR 18. That same day, Nelson sent Mrs. Pingree a status letter informing her that Principal was still seeking proof that her husband was actively at work between September 1 and December 4, 2001 and that Principal had requested this information from TTF in the form of payroll records.

On March 4, 2002, McKnight faxed Nelson a typed document from Kurt Terlip regarding Mr. Pingree's last paychecks from TTF. The document indicated that Mr. Pingree's last check for director fees was dated August 1, 2001, but Kurt Terlip wrote in abbreviations for October and September with question marks above this statement. The document stated that Mr. Pingree's last paycheck was dated September 15, 2001 and included regular pay of 40 hours and vacation pay of 200 hours. AR 20. Next to the notation of vacation, Kurt Terlip wrote in "thru Nov. 15?" Becky Trickey, a Senior Technical Analyst at Principal,[12] testified that the document was not clear, especially with the question marks, and she waited for the statements of co-workers or other individuals. Trickey Depo. at 27-28. Trickey did not

---

[12]     Trickey is a manager for life insurance claims. She spends 65 to 75 per cent of her time on life insurance claims and acts as a reviewer.

inquire whether Mr. Pingree had received a termination of benefits notice.

On March 21, 2002, Principal sent Mrs. Pingree a letter which indicated that it still needed verification that her husband was actively at work after September 1, 2001.  AR 20.  The letter stated that the evidence must be produced within 15 days or the claim would be decided based on the information provided to date.  Principal received no further information and on April 8, 2002, it sent the Pingree family a letter which denied the claim for benefits.  The letter explained that TTF had related that Mr. Pingree ceased work as CFO on September 1, 2001 and became an accounting consultant, but that despite requests for documentation that Mr. Pingree continued working, TTF provided no documentation.

On April 16, 2002, McKnight asked Principal to reconsider the claim.  He faxed Principal two letters (one from a banker and another from a financial planner), which showed that (1) Mr. Pingree had assisted Kurt Terlip to discuss "the financial objectives of Mr. Terlip and Triple T Foods" in August of 2001; (2) on September 5, 2001, Kurt Terlip, Mr. Pingree and a representative of Lawing Financial Group met to discuss financial planning strategies for Kurt Terlip; and (3) in November of 2001, Mr. Pingree visited with Kurt Terlip to explore his estate plan and investment strategies.  On May 1, 2002, Trickey noted that the two letters indicated only that on three occasions, Mr. Pingree assisted Kurt Terlip on his own estate matters and financial decisions, and that they did not show that Mr. Pingree worked on a continuous basis for 30 hours a week.  AR 139.

On May 15, 2002, Principal again requested documentation that Mr. Pingree was working the requisite hours for TTF between September 1 and December 4, 2001.  It requested that this information be sent by June 28, 2002.  Having received no further information by July 26, 2002, Principal again requested verification that Mr. Pingree was working the requisite number of hours for TTF.  It requested

that this information be sent within 15 days.[13]  On August 26, 2002, Principal sent the Pingrees a letter which denied reconsideration of the prior denial.

The Pingree family thereafter filed suit against TTF and Kurt Terlip in state court in Kansas.  On November 10, 2004, plaintiffs asked Principal to reconsider the claim based on information discovered in the state court case.  On November 15 and December 3, 2004, plaintiffs asked Principal to further supplement the record.

On December 13, 2004, Trickey wrote plaintiffs' counsel, acknowledged receipt of the supplemental materials (which included copies of all depositions in the state court case), and agreed to reconsider plaintiffs' claim.  Principal also invited plaintiffs to submit any additional materials which they believed were necessary to complete the administrative record.  On December 20, 2004, plaintiffs responded that they considered their submission to be final.

Trickey undertook an extensive analysis and file review.  Following that review, on March 17, 2005, she upheld the prior denial of benefits.  Trickey concluded that Mr. Pingree was terminated from TTF employment on September 4, 2001, and that after that date (1) he did not generate any type of work product for TTF; (2) he did not work 30 hours per week performing duties for TTF; and (3) he did not return to the usual place of TTF business, perform his normal job duties as CFO, or work in any other capacity for TTF.  AR 157-58.  Trickey concluded that the record required a finding that Mr. Pingree was not a full-time employee at time of his death and had ceased active work in September of 2001.  AR 158.  In a letter dated March 17, 2005, Trickey communicated the final denial of benefits to plaintiffs' attorney.

---

[13]     Kurt Terlip recalls that Principal asked for documentation that Mr. Pingree was at work after September 4, 2001, but testified that there was no such documentation because Mr. Pingree was not employed after that date.  Kurt Terlip Depo. at 155-56.

Following this decision, plaintiffs amended their state court pleadings to add a claim against Principal for denial of ERISA benefits.  Defendants then removed the case to this Court.

Principal admits that it was acting as a fiduciary on the Pingree claim to make sure that the beneficiaries received the benefits to which they were entitled.

Ann Collins is a former claims examiner for Principal.  She worked on the Pingree claim and reviewed Nelson's original denial of the claim.  Collins testified that affidavits, declarations, depositions and employee statements are acceptable forms of proof on a death claim, but she did not know whether McKnight's deposition testimony or statements to Principal were sufficient to show that Mr. Pingree was working for TTF at the time of his death.  Collins said that Principal needed "something showing that he was actively at work, any documentation that he would have signed in a capacity that he worked at."  Collins acknowledged that the beneficiaries could not force TTF to get affidavits from other employees, or testimony that Mr. Pingree was indeed at work, working a specific number of hours.

At the time of her deposition, Trickey did not know whether Principal had refunded the premiums which TTF paid on behalf of Mr. Pingree after September 4, 2001.  In May of 2002, however, Principal in fact credited TTF for such premiums.  AR 21, 162, 191, 194.

Trickey said that she did not know when Mr. Pingree was last actively at work, but that she thought his coverage terminated September 30, 2001.  She testified that if coverage terminated on September 30, 2001, Mr. Pingree had 31 days (until October 31, 2001) to apply for a conversion policy.  Trickey believes that even if an individual does not receive notice of the right to convert the policy after the termination of employment, individual coverage under the group policy terminates when the 31-day

conversion period expires.  Trickey did not consider Mr. Pingree's conversion right or whether TTF had given Mr. Pingree notice of such a right.

Plaintiffs argue that Principal's denial of benefits is arbitrary and capricious because it ignored evidence that (1) Mr. Pingree continued as an officer and director of TTF after September 4, 2001 and (2) Mr. Pingree continued to work as an accounting consultant for TTF after September 4, 2001.

### Conclusions Of Law

## I.    Standard Of Review

Here, the TTF group policies grant Principal discretion in interpreting the terms of and determining the grant of benefits under those policies.  Accordingly, the Court must uphold Principal's decision unless it was arbitrary and capricious.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Under the arbitrary and capricious standard of review, a court "may not overturn a plan administrator's decision if it was reasonable, given the terms of the plan, and made in good faith." Jones v. Kodak Med. Assistance Plan, 169 F.3d 1287, 1292 (10th Cir. 1999). The Tenth Circuit has explained this as follows:

> When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one.  It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious.  The decision will be upheld unless it is not grounded on any reasonable basis. The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness--even if on the low end.

Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999).

Where a conflict of interest exists, the conflict must be weighed as a factor in determining whether there was an abuse of discretion.  Firestone, 489 U.S. at 115; Chambers v. Family Health Plan Corp., 100 F.3d 818, 826-27 (10th Cir. 1996).  The Tenth Circuit has found that "the arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged, such as

trustee bias in favor of a third-party or self-dealing by the trustee." <u>Id.</u> at 827 (quoting <u>Sage v. Automation, Inc. Pension Plan & Trust</u>, 845 F.2d 885, 895 (10th Cir. 1988)).  A reviewing court must use a "sliding scale" approach under which "the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." <u>Id.</u> at 825.

Principal concedes that it has a conflict of interest because it is the insurer under the TTF group policies and also a fiduciary toward plaintiffs in its capacity as the administrator of the group policies.  When an inherent conflict of interest exists, as it does here, the less deferential standard requires the administrator or fiduciary to prove the reasonableness of its decision under the traditional arbitrary and capricious standard.  <u>Fought v. Unum Life Ins. Co. of Am.</u>, 379 F.3d 997, 1006 (10th Cir. 2004), <u>cert. denied</u>, 125 S. Ct. 1972 (2005).  Accordingly, Principal bears the burden to prove that its decision to deny benefits was reasonable under the arbitrary and capricious standard.  To do so, Principal must demonstrate that its interpretation of the insurance policies is reasonable and that its application of those terms is supported by substantial evidence.  <u>Allison v. Unum Life Ins. Co. of Am.</u>, 381 F.3d 1015, 1022 (10th Cir. 2004); <u>Fought</u>, 379 F.3d at 1006.

**II.     Denial Of Life Insurance Benefits**

Principal concluded that Mr. Pingree was terminated from his employment at TTF on September 4, 2001 and that after that date (1) he did not generate any type of work product for TTF; (2) he did not work 30 hours per week performing duties for TTF; and (3) he did not return to the usual place of TTF business, perform normal job duties as CFO for TTF, or work in any other capacity for TTF.  AR 157-58. Principal therefore concluded that Mr. Pingree was not a full-time employee at time of his death and had

ceased active work in September of 2001.  AR 158.  In support of its decision, Principal outlined the

following evidence:

> • A memorandum prepared by counsel for TTF, Robert J. Rayburn, III, Esq., outlining the terms of the termination, which was sent to the Crawford County Sheriff, the Chief of Police and a private security firm, Clarence M. Kelly & Associates;

> • Billing records from a private security firm who was retained to escort Mr. Pingree from the premises on September 4, 2001;

> • The deposition testimony of Chris Terlip, half owner of TTF that he terminated Gary Pingree on September 4, 2001, and had him escorted from TTF's premises;

> • The termination letter dated September 4, 2001 prepared by Chris Terlip;

> • The deposition testimony of Kurt Terlip, half owner of TTF, who replied "No" when he was asked at his deposition whether Mr. Pingree did anything after he was terminated;

> • The deposition testimony of Kurt Terlip, who, when asked at his deposition about being asked to provide documents to the insurance company to demonstrate that Mr. Pingree was actively at work, replied "I do remember them asking for documentation and there wasn't any, because Gary wasn't employed."

> • The deposition testimony of Sara Little, who was hired by TTF on November 1, 2001 as the Controller for TTF. When asked "Prior to that who had been doing the job you're doing?" She replied: "Gary Pingree."

> • The deposition testimony of Terri Strand, an accounting clerk at TTF, who was asked: "Did Gary help you even after he left with some of the jobs that you had to do there, since he had such familiarity with some of the work that you were doing?" She replied: "No. They had an accountant come in."

> • The deposition testimony of Mrs. Pingree in which she disclaimed any real knowledge regarding what Gary Pingree was doing for the Terlips / TTF following his termination, if anything, and had no specific knowledge as to what Gary was doing between September 4, 2001 and the date of his death.

AR 156-57.

Plaintiffs first argue that Principal ignored evidence that Chris Terlip lacked authority to terminate Mr. Pingree as an officer or director of TTF.  The Court need not decide whether Principal considered such evidence because Mr. Pingree's legal title at TTF, if any, is immaterial to the claim against Principal.  The Officer and Supervisor policies do not afford coverage simply because an individual is a designated officer or director.  As explained elsewhere, to qualify for coverage under either policy, an individual must be actively at work during the relevant time frame.

Plaintiffs argue that Principal ignored evidence that Mr. Pingree was actively at work for TTF after September 4, 2001.  Such evidence, however, was meager.  McKnight testified that based on his conversations with Mr. Pingree and Kurt Terlip, he understood that Mr. Pingree continued to do consulting work for TTF.  See McKnight Depo. at 71-73.  McKnight testified that he considered the Terlips (Bob, Kurt and Chris) to be the same thing as TTF.  See id. at 71-73, 98.  McKnight's conclusion that working for any of the Terlips was the same thing as working for TTF is refuted by the administrative record.  Chris Terlip and Kurt Terlip owned TTF and in 2001, Bob Terlip was no longer involved with the company.  Bob Terlip sold the company in 1998 and under the sale agreement, he could not exercise any control or make decisions for the company.  See Bob Terlip Depo. at 11, 45-46.  McKnight admitted that "it was just a general assumption that [Mr. Pingree] was doing work for the Terlips and the company."  McKnight Depo. at 72.  McKnight testified that Mr. Pingree said that he was still doing work for "them," i.e. the Terlips; he did not specifically say that he was doing work for TTF.  See id. at 75.  McKnight also testified that Kurt Terlip told him that Mr. Pingree continued to do "consulting work" without specifying for whom. See id. at 79.

Plaintiffs note that McKnight told a Principal representative that after September 4, 2001, Mr. Pingree worked six hours per day and was always on call. AR 9-10. McKnight's statement is apparently based on statements from Kurt Terlip. See Plaintiffs' Response (Doc. #58) at 33 (Kurt Terlip told McKnight that Mr. Pingree was working six hours a day for TTF).[14] The record does not reflect that McKnight, who essentially acted as an advocate for recovery of the life insurance proceeds, had personal knowledge of the number of hours that Mr. Pingree worked after September 4, 2001 or whether Mr. Pingree was working for the company or the Terlips personally. In fact, immediately after McKnight told a Principal representative that Mr. Pingree worked six hours a day, he stated that he would follow up with Kurt Terlip. McKnight Depo. at 66.

In addition to McKnight's testimony that Mr. Pingree worked six hours a day, plaintiffs note that Mrs. Pingree testified that her husband worked on TTF business in the early mornings and evenings. As with McKnight, the record does not reflect that Mrs. Pingree knew how much of Mr. Pingree's work, if any, was on TTF business. Shortly after Mr. Pingree died, Mrs. Pingree told Principal that her husband worked for Bob Terlip during the day and Kurt Terlip during the evening. AR 17. Mrs. Pingree also testified that she thought that working for Kurt Terlip, Chris Terlip and/or Bob Terlip was the same thing as working for TTF. See Mrs. Pingree Depo. at 37, 51-52. She conceded, however, that her husband would have understood the legal distinction between working for the Terlips personally and working for TTF as a company. See id. In addition, Mrs. Pingree testified that her husband kept the files for work on Kurt Terlip's personal business separate from TTF files. See id. at 21-22. The testimony of McKnight

---

[14]   Plaintiffs maintain that Mr. Pingree also gave McKnight this same information, but they do not cite record evidence which supports their assertion.

and Mrs. Pingree, that Mr. Pingree was working for the Terlips after September 4, 2001, is insufficient to show that Mr. Pingree was actively at work for TTF.

Plaintiffs argue that Mr. Pingree must have been actively at work at TTF after September 4, 2001 because TTF did not give Mr. Pingree a notice of rights under COBRA or a notice of his right to convert his coverage under the group policy to an individual policy. Based on the administrative record, however, Principal could reasonably find that TTF intended to give Mr. Pingree notice under COBRA, but simply never did so. In particular, Chris Terlip's attorney prepared a list which stated that COBRA information and documents must be given to Mr. Pingree and that he must sign a receipt for them. Although Chris Terlip did not know why no one did so, Kurt Terlip testified that he expected BKD to send the required notice. Combined with other evidence that Mr. Pingree was not actively at work, Principal reasonably concluded that by itself, the fact that Mr. Pingree did not receive the required notices was insufficient to show that he was actively at work after September 4, 2001. Likewise, the fact that TTF continued to pay Mr. Pingree's insurance premiums is insufficient to establish that Mr. Pingree was actively at work after September 4, 2001. Little testified that TTF paid the insurance premiums on several non-employees for a number of months and that she started to correct this information in January of 2002, shortly after Mr. Pingree died. Little Depo. at 49-50.

Plaintiffs argue that Principal ignored evidence that Kurt Terlip agreed to continue Mr. Pingree's life and health insurance benefits. Plaintiffs' Response (Doc. #58) at 31-34. Kurt Terlip denies the existence of such an agreement, and based on the administrative record, Principal could have reasonably concluded that such an agreement did not exist. Principal did not specifically address whether Kurt Terlip agreed to continue Mr. Pingree's insurance, but it concluded that no such agreement would establish that

- 22 -

Mr. Pingree worked 30 hours per week for TTF.  In particular, Mrs. Pingree testified that Kurt Terlip said "*I* will keep your insurances in force. . . .  *I* will take care of you on that."  Mrs. Pingree Depo. at 53 (emphasis added); see also id. at 30 (Kurt promised Mr. Pingree that "he would take care of him" including "all of his insurances").  Mrs. Pingree explained that she had no idea whether "I" meant Kurt Terlip or TTF.  See id. at 53.  Elsewhere, Mrs. Pingree testified that her husband told her that he was going to work for "Kurt and Bob."  See id. at 30; see also id. at 35 (Mr. Pingree said that he was going to work on accounting and investments for Kurt Terlip and Bob Terlip); AR 17 (Mrs. Pingree told Principal that her husband worked for Kurt Terlip and Bob Terlip).  Substantial evidence supports Principal's conclusion that after September 4, 2001, Mr. Pingree did not work for TTF, but instead worked for Kurt Terlip personally on investments and estate matters.

Plaintiffs argue that Little testified that she knew that TTF intended to furnish benefits for Mr. Pingree.  See Plaintiffs' Response (Doc. #58) at 33-34.  Little, however, did not testify that Mr. Pingree was actively at work after September 4, 2001.  Little testified that TTF paid the insurance premiums for several non-employees (including Mr. Pingree) for a number of months and that she took care of correcting this information starting in January of 2002.  Little Depo. at 49-50.  Regardless whether TTF intended to continue to provide insurance benefits to Mr. Pingree, the Principal policies required that Mr. Pingree be actively at work to be covered.  Little admitted that on the October 2001 statement for the BMA policy, she noted that Mr. Pingree had been terminated on September 4, 2001.  Id. at 15-16.

Plaintiffs argue that within a week of Mr. Pingree's death, Kurt Terlip took three or four boxes of TTF records, as well as personal business records which Mr. Pingree kept separately for Kurt Terlip.  Plaintiffs' Response (Doc. #58) at 34.  Kurt Terlip denied picking up such files.  Even if Principal assumed

that Kurt Terlip did pick up TTF files, that fact does not compel a conclusion that Mr. Pingree was actively at work for TTF for 30 hours a week after September 4, 2001.[15]

Plaintiffs argue that both before and after September 4, 2001, Mr. Pingree worked for TTF at home and that the Pingree home in effect became a place of business for TTF. Plaintiffs' Response (Doc. #58) at 32. Although Bob Terlip testified that Mr. Pingree sometimes worked at home before 1998, no evidence suggests that he did so on a regular basis or that his home was effectively a place of business for TTF. In any event, the fact that Mr. Pingree worked at home on some occasions before 1998 does not establish that he was actively at work for TTF for 30 hours a week after September 4, 2001.

Plaintiffs apparently maintain that Mr. Pingree received his last vacation paycheck on November 15, 2001 and that he was therefore within the 31-day period for conversion of his group coverage to an individual life policy. Based on the typed statement of Kurt Terlip, on which plaintiffs rely, Mr. Pingree received his last paycheck on September 15, 2001 and that check included vacation pay of 200 hours. AR 734. Kurt Terlip did note next to this statement "thru 11-15-01?," but that notation does not reflect that Mr. Pingree received checks through that date. Id. Principal determined that the typed document from Kurt Terlip was unclear and that further statements were necessary to establish that Mr. Pingree was actively at work after September 4, 2001. Even if TTF gave Mr. Pingree checks for vacation pay through November 15, 2001, Principal could reasonably conclude that his employment ended September 4, 2001.[16]

---

[15]     Likewise, the fact that TTF permitted Mr. Pingree to continue to use a company car, cell phone and credit card does not establish that he was actively at work after September 4, 2001.

[16]     In any event, under the policies, vacation pay after September 4, 2001 could not be characterized as "regularly scheduled" vacation days. AR 104.

Substantial evidence supports Principal's conclusion that Mr. Pingree was not actively at work for TTF after September 4, 2001.[17]  See Nance v. Sun Life Assur. Co. of Canada, 294 F.3d 1263, 1269 (10th Cir. 2002) (administrator's decision must be upheld if grounded on any reasonable basis; basis need not be only logical one or even best one); Kimber, 196 F.3d at 1098 (same).  Therefore the Court finds in favor of Principal on plaintiffs' claim for wrongful denial of benefits.

**IT IS THEREFORE ORDERED** that Defendant Principal Life Insurance Company's Motion For Summary Judgment (Doc. #45) filed December 19, 2005 be and hereby is **OVERRULED as moot**.

**IT IS FURTHER ORDERED** that plaintiffs take nothing on their claim against Principal Life Insurance Company.

Dated this 7th day of April, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[17]      Plaintiffs criticize Principal for not specifically addressing evidence which contradicts its conclusion that Mr. Pingree was not actively at work after September 4, 2001.  Principal certainly could have discussed the evidence in greater detail, but the record reflects that it considered the entire administrative record.  In this order, the Court has addressed plaintiffs' evidence and finds that nearly all of plaintiffs' evidence is immaterial or tangential to the issue whether Mr. Pingree was actively at work for TTF after September 4, 2001.