## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ESTATE OF GARY W. PINGREE, UEALENE M. PINGREE, individually and as Administrator, KIM PINGREE MARTIN and PAM PINGREE PEAK, | ) ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) ) | No. 05-2173-KHV |
| TRIPLE T FOODS, INC., KURT TERLIP and PRINCIPAL LIFE INSURANCE COMPANY, | ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM AND ORDER

Gary W. Pingree died in a car accident on December 4, 2001. Pingree's estate, his wife and his two daughters filed suit to recover life insurance proceeds and other damages from Triple T Foods, Inc. ("TTF"), Kurt Terlip, a part owner of TTF, and Principal Life Insurance Company ("Principal"), which insured the TTF group life insurance plan. Plaintiffs assert claims for violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), breach of contract, breach of fiduciary duty and retaliatory discharge. This matter is before the Court on Kurt Terlip's Motion For Summary Judgment (Doc. #41) and Defendant's, Triple T Foods, Inc., Motion For Partial Summary Judgment (Doc. #43), both filed December 19, 2005. For reasons stated below, the Court sustains both motions in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th

Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  <u>Anderson</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  <u>Applied Genetics</u>, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>Anderson</u>, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-52.

**Factual Background**

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiffs, the non-movants.[1]

On December 4, 2001, Gary Pingree, the husband of Uealene Pingree, died in an automobile accident. The Pingrees had two daughters – Kim Pingree Martin and Pam Pingree Peak.

**I.     Pingree's Employment At TTF Before September 4, 2001**

Triple T Foods, Inc., a Kansas corporation in the pet food business, employed Pingree from 1990 to September 4, 2001. Kurt Terlip and Chris Terlip, who are brothers, each own 50 per cent of the TTF stock. On September 4, 2001, Kurt Terlip was president of TTF, Chris Terlip was vice president and Pingree was chief financial officer ("CFO"), secretary and treasurer. These three individuals also comprised the board of directors.

In January of 2001, Pingree gave Chris Terlip notice of a board meeting to vote on a potential sale of the TTF dog food manufacturing facility in Frontenac, Kansas. Chris Terlip looked at the notice and told Pingree, "You do this and I will fire your ass." He also told Kurt Terlip and Pingree that voting for such a sale would violate their fiduciary duties to TTF. Kurt Terlip and Pingree believed that the proposed sale was in best interests of TTF, however, and at the board meeting on January 31, 2001, over the objection of Chris Terlip, they voted to sell it. The sale of the facility required only a majority vote and no vote of shareholders was required.

---

[1]        This version of the facts is based on the briefing of the TTF motion for summary judgment. The material facts on Kurt Terlip's motion for summary judgment are substantially the same. Any difference in the versions of facts is immaterial to the Court's rulings in this order.

On March 19, 2001, Chris Terlip and Kurt Terlip executed an agreement and proxy pertaining to the sale of TTF's Natural Life brand name. They agreed to vote for a sale to Grasshopper Packing Company, a limited liability company set up by Chris Terlip, and to terminate Pingree's employment before July 15, 2001. Id. The agreement provided in part as follows:

> The parties hereto agree that, except as mutually agreed in writing, Mr. Gary Pingree shall not be rehired or engaged on or after July 15, 2001, by any business or entity in which both Chris Terlip and Kurt Terlip own, directly or indirectly, any interest therein. . . . If Mr. Pingree has not been terminated by July 15, 2001, then Chris Terlip and Kurt Terlip hereby grant the other his irrevokable [sic] proxy, as shareholder, officer and director, to specifically and solely so terminate, effective on or after July 15, 2001, Mr. Gary Pingree as an officer, director, employee, consultant, contractor and in all other capacities from Triple T Foods, Inc.

Id.

On May 31, 2001, TTF terminated its agreement to sell the dog food facility. Kurt Terlip and Pingree later found another purchaser and at a meeting on July 5, 2001, they again voted to sell the facility over Chris Terlip's objection.

## II.     Principal Life Insurance Policies For TTF Officers And Supervisors

As an employee benefit, TTF purchased group life insurance from Principal – one policy for eligible officers and another policy for eligible supervisors of the company. Except for the benefit amount, the policies had identical terms. Both policies provided that individual coverage terminated on the earliest of "the end of the Insurance Month in which the Member ceases to be a Member as defined in PART I; or . . . the end of the Insurance Month in which the Member ceases Active Work." See Part III, Section C, Article 1.

Both policies provided that to be eligible, an individual must be a "full-time employee," defined as follows:

any person regularly scheduled to work for the Policyholder for at least 30 hours a week. Work must be at the Policyholder's usual place or places of business or at another place to which an employee must travel to perform his or her regular duties.

Part I - Definitions; AR 94, 348.  Both policies defined "active work" and "actively at work" as the "active performance of all of a Member's normal job duties at the Policyholder's usual place or places of business."  Id.  The policies waived the actively-at-work requirement for members who were absent because of a regularly scheduled day off, holiday or vacation day.  Section B, Article 1.

Under both policies, a member qualified to purchase an individual policy if group insurance terminated because the member ceased active work.  Section F, Article 1(b)(1).  Both policies contained a 31-day grace period after a participant was last employed to convert from a group life policy to an individual policy.  Accordingly, if a participant died within the 31-day grace period, the policy waived the actively-at-work requirement and the participant's beneficiaries could collect on the policy.  Both policies stated that "[n]otice of the individual purchase right must be given to the Member by the Policyholder before insurance under th[e] Group Policy terminates, or as soon as reasonably possible thereafter."  Section F, Article 1(c).  Based on this language, Principal had discretion regarding when an individual could exercise the purchase right.  Where a former employee has not received notice of the right to purchase an individual policy, Principal does not necessarily deny the claim if he or she dies after the 31-day period.

Under both policies, Principal had complete discretion to construe and interpret the policies and determine eligibility for benefits.  See Part II, Section A, Article 9.

### III.   Pingree's Employment Status After September 4, 2001

On September 4, 2001, to thwart the impending sale of the dog food facility by creating a board deadlock on the issue, Chris Terlip informed Pingree that he was terminated from all positions with TTF. Chris Terlip gave Pingree a letter which stated that (1) pursuant to the unanimous written consent of the shareholders, he was terminated as a member of the board of directors; and (2) pursuant to the unanimous written consent of the board of directors, he was terminated as an officer, employee, agent or consultant of the company.  Chris Terlip signed the letter, ostensibly as president of TTF and ostensibly on behalf of all shareholders and directors of TTF.[2]  Immediately thereafter, security personnel retained by Chris Terlip escorted Pingree from the premises.  Kurt Terlip testified that he let his brother fire Pingree and that his brother had authority to do so because he had given him such authority.

Pingree told his wife that Chris Terlip had terminated him, but that he was going to do consulting work for Kurt Terlip and Bob Terlip (the father of Kurt Terlip and Chris Terlip) and that Kurt Terlip had promised to maintain life and health insurance benefits for him.  Later that evening, the Pingrees went to the home of Kurt Terlip.  Kurt Terlip told them that Pingree would work with him and Bob Terlip on accounting, "his investments and whatever."  Kurt Terlip reassured them that he would keep Pingree's health and life insurance benefits, and repeated this assurance six or seven times.

---

[2]        Attorneys for Chris Terlip had advised him that as TTF president, he had the power to terminate Pingree's employment. AR 1071.  Under TTF bylaws, however, Chris Terlip was vice president (not president) of TTF.  Because no board meeting had been held on the issue, Chris Terlip may not have had actual authority to terminate Pingree's position as an officer of TTF.  Likewise, Chris Terlip may not have had authority to terminate Pingree as a director because no shareholder meeting had been held on the issue.  The agreement between Chris Terlip and Kurt Terlip regarding the termination of Pingree's employment was not filed with Pingree, the secretary of TTF.  The bylaws required such a filing to formalize shareholder action without a meeting.

On or shortly after September 4, 2001, Pingree called Ted McKnight, a representative of CBIZ Benefits and Insurance Services ("CBIZ"), which provided insurance and employment services to TTF.[3] Pingree told McKnight that his employment at TTF had terminated.  Shortly after the call, McKnight called Kurt Terlip and told him that he just learned that Pingree's employment had terminated.  McKnight asked Kurt Terlip about sending a COBRA notice to Pingree, but Kurt Terlip told him to "just hold on" and leave things as they were.  McKnight therefore understood that Pingree's benefits would remain in place.  Kurt Terlip told McKnight that Pingree was still doing consulting work, but Kurt Terlip did not specify whether it was for TTF or for him personally.  After September 4, 2001, Pingree continued to use a TTF car, cell phone and credit card.  Pingree told McKnight that he thought that TTF had terminated him because of his vote on the dog food facility.

Pingree told McKnight that he was still doing some work for the Terlips.  McKnight understood that Pingree "was still continuing to work in some capacity" and that he assisted in preparing some tax returns for the Terlips.  McKnight did not testify, however, that such work was for TTF.

When an individual's employment was terminated, TTF policy required that a COBRA notice be sent within one week.  Chris Terlip's attorney put together a list of things to do with regard to Pingree's termination.  Chris Terlip gave the list to Kurt Terlip and the TTF accounting firm, Baird, Kurtz and Dobson ("BKD").  The list stated that "COBRA information and documents, including medical, dental, life, and disability must be given to Pingree and he must sign a receipt for it.  The same information should also be mailed to Gary's house certified return receipt requested."  No one sent Pingree any COBRA notice,

---

[3]        In 2001, CBIZ was broker for the TTF health insurance and 401(k) plans.  See McKnight Depo. at 64.  CBIZ did not handle the Principal policy or other group life insurance benefits for TTF.

however, or any notice of his right to continue coverage under the group life insurance policy.[4] Chris Terlip could not explain why no one did so. Kurt Terlip testified that days after Pingree was terminated, he saw the attorney's list. Kurt Terlip, however, did not think that his brother expected him to follow up on the items on that list. Based on the list, Kurt Terlip expected someone at BKD to send Pingree a COBRA notice.

Uealene Pingree testified that after September 4, 2001, her husband worked for Kurt Terlip during the early morning hours at home – sometimes as early as 3:00 a.m., evenings and usually Sundays. She did not know what kind of work he was doing, however, or for whom.[5] Mrs. Pingree testified that her husband worked several hours a day in the early morning or evening. She thought that Kurt Terlip, Chris Terlip and/or Bob Terlip were the same as TTF, but she testified that her husband would have understood the distinction between the individuals and the company. Kurt Terlip admitted that both he and Pingree expected Pingree to be paid for the services which he provided, but he claimed that Pingree died before they could agree on specific compensation.[6]

In the summer of 2001, Kurt Terlip asked Pingree to provide a second opinion on personal investment options. Pingree continued to provide this advice after September of 2001.

---

[4]     Before Pingree's employment was terminated, he was responsible for COBRA notices at TTF. See McKnight Depo. at 85.

[5]     Bob Terlip, TTF founder and president until 1998, testified that while he was president, Pingree sometimes worked at home.

[6]     Kurt Terlip testified that after September 4, 2001, he told Pingree that he would compensate him after he set up Terlip Investments. Kurt Terlip testified that he never discussed a specific amount of compensation.

On November 1, 2001, TTF hired Sara Little as controller.  From the beginning, Little understood that Pingree had a company car.  Through December 1, 2001, TTF continued to pay the Principal premiums for Pingree.  No one at TTF told Little that these payments were a mistake.  TTF paid insurance premiums for several other non-employees, and starting in January of 2002, Little took care of correcting this situation.

**IV.    Pingree's Death And Principal's Investigation Of The Life Insurance Claim**

As noted, Pingree died in a car accident on December 4, 2001.  Mrs. Pingree and the Pingree daughters were the designated beneficiaries under the Principal group policy.  Within a week after his death, Kurt Terlip went to the Pingree home and removed three or four boxes of documents, including TTF files and files for his personal business (which Pingree had kept separate from TTF files).  Terri Strand, who was Chris Terlip's secretary and performed bookkeeping functions for TTF, testified that at the funeral, she probably told Kevin Williams, a former BKD accountant, that she "did not know what she was going to do now that Gary was gone, because he was helping [her] with accounting work."  Immediately after Strand so testified, she added, "I mean, I don't know that I said that."  Strand Depo. at 24-25.

A few weeks after Pingree died, Kurt Terlip told Mrs. Pingree that she needed to collect under the Principal life insurance policy, which she did not know about until that time.

On January 8, 2002, Principal received a claim form for life insurance benefits for Pingree.  Kurt Terlip and McKnight completed a portion of the claim form regarding "Information from the Group Planholder" and Kurt Terlip signed that portion of the form.  In the field for "Date member was last actively at work," they stated "9-01."  Where the claim form asked for "Reason member ceased active work," however, the box for "death" was checked.  The claim form listed the "date of death" as December 4,

2001.

On January 31, 2002, Kurt Terlip sent McKnight a memo which indicated that Strand, "at the office up town" had received a fax from Principal.  Kurt Terlip was irritated that Principal was not paying the policy and that it was communicating about the issue with Strand, and told McKnight that "nothing should be going to Terri Strand."

On February 1, 2002, Diane Nelson of Principal called Kurt Terlip.  Kurt Terlip confirmed that TTF had terminated Pingree's employment on September 1, 2001.  Nelson informed Kurt Terlip that Pingree's coverage apparently ceased at the end of the month in which he stopped work, and that she would be recommending that Principal deny the claim.  Id.  Kurt Terlip told Nelson that he had paid the policy premiums in good faith and that he would do everything in his power to fight a denial.[7]  When Nelson asked Terlip why he had continued to pay premiums, Terlip stated that Pingree had worked for him for 13 years and was an officer of the company.  Nelson confirmed with Terlip that Pingree had ceased work as CFO in September of 2001.

Later on February 1, 2002, Nelson called McKnight.  McKnight confirmed that in September of 2001, Pingree was no longer a CFO or officer for TTF, but that he had continued to work as an "accounting consultant" and most definitely was working for the company.  McKnight stated that Pingree was a supervisory employee and that he worked six hours a day and was on call 24 hours a day.  Nelson testified that she had heard of cases where an employee essentially worked only for benefits with no salary.  Nelson was satisfied that Pingree had been employed "to some degree" after September 4, 2001.

---

[7]     Kurt Terlip later testified that TTF had continued to pay Pingree's health insurance premium by mistake or oversight.  See Kurt Terlip Depo. at 37, 70, 76.  McKnight testified that Kurt Terlip had never told him as much.  McKnight Depo. at 56.

On February 15, 2002, Nelson contacted Mrs. Pingree, inquiring whether she knew how often or when her husband worked as an accounting consultant for TTF. Mrs. Pingree stated that she had no idea. Mrs. Pingree told Nelson that her husband worked for Bob Terlip during the day and Kurt Terlip during the evening. Mrs. Pingree assured Nelson that her husband worked for TTF after September 1, 2001. Later on February 15, 2002, Nelson asked McKnight to obtain TTF payroll records for Pingree from September 1 through December 4, 2001.

On March 4, 2002, McKnight faxed Nelson a typed document from Kurt Terlip regarding Pingree's last paychecks from TTF. The document indicated that Pingree's last check for director fees was dated August 1, 2001, but Kurt Terlip or McKnight wrote in abbreviations for October and September with question marks above this statement. The document stated that Pingree's last paycheck was dated September 15, 2001 and included regular pay of 40 hours and vacation pay of 200 hours. Next to the notation of vacation, Kurt Terlip or McKnight wrote in "thru Nov. 15?" Becky Trickey, a Senior Technical Analyst at Principal, testified that the document was not clear, especially with the question marks, and she waited for the statements of co-workers or other individuals.

On April 8, 2002, Principal sent the Pingree family a letter which denied the claim for benefits. The letter explained that TTF had related that Pingree had ceased work as CFO on September 1, 2001 and become an accounting consultant, but that despite requests for documentation that Pingree continued working, TTF provided no documentation.

On April 16, 2002, McKnight asked Principal to reconsider the claim. He faxed Principal two letters (one from a banker and another from a financial planner) which showed that (1) Pingree had helped Kurt Terlip discuss his financial objectives and those of TTF in August of 2001; (2) on September 5, 2001,

Kurt Terlip, Pingree and a representative of Lawing Financial Group met to discuss financial planning strategies for Kurt Terlip; and (3) in November of 2001, Pingree visited with Kurt Terlip to explore estate plan and investment strategies.  On May 1, 2002, Trickey noted that the two letters indicated only that on three occasions, Pingree assisted Kurt Terlip on his own estate matters and financial decisions, and they did not show that Pingree worked on a continuous basis for 30 hours a week.

On August 26, 2002, Principal sent the Pingree family a letter which denied reconsideration of the prior denial.  The Pingree family thereafter filed suit against TTF and Kurt Terlip in state court in Kansas. On November 10, 2004, plaintiffs again asked Principal to reconsider the claim, but on March 17, 2005, Principal upheld the prior denial of benefits.  Principal concluded that Pingree was terminated from TTF employment on September 4, 2001 and that after that date, (1) he did not generate any type of work product for TTF; (2) he did not work 30 hours per week performing duties for TTF; and (3) he did not return to the usual place of TTF business, perform his normal job duties as CFO, or work in any other capacity for TTF.

Following this decision, plaintiffs amended their state court pleadings to add a claim against Principal for denial of ERISA benefits.  Defendants then removed the case to this Court.

Ann Collins is a former claims examiner for Principal.  She worked on the Pingree claim and reviewed Nelson's original denial of the claim.  Collins testified that affidavits, declarations, depositions and employee statements are acceptable forms of proof on a death claim.  Collins said that Principal needed "something showing that he was actively at work, any documentation that he would have signed in a capacity that he worked at."

Trickey said that she did not know when Pingree was last actively at work, but that she thought his coverage terminated September 30, 2001. She testified that if coverage terminated on September 30, 2001, Pingree had 31 days (until October 31, 2001) to apply for a conversion policy. Trickey believes that even if an individual did not receive notice of the right to convert, individual coverage under the group policy would terminate when the 31-day conversion period expired. Trickey did not consider Pingree's conversion right or whether TTF had given him notice of such a right.

Plaintiffs allege that by failing to ensure that Pingree received life insurance benefits after September 4, 2001, TTF and Kurt Terlip breached their contract with him and breached their fiduciary duties to Pingree. Pingree's estate also alleges that TTF discharged him in violation of Kansas public policy. In particular, the estate alleges that TTF terminated Pingree's employment because of his good faith vote on the sale of the dog food facility. Plaintiffs also allege that TTF violated the notice requirements of ERISA and COBRA and interfered with the receipt of ERISA benefits by providing inaccurate information to Principal.

Defendants seek summary judgment on all claims except plaintiffs' claim regarding lack of notice under ERISA and COBRA. As to plaintiffs' claim that defendants breached their agreement to provide life insurance benefits, defendants argue that they are entitled to summary judgment because (1) the alleged agreement is void because it is too vague and indefinite to be enforced; (2) their obligations under the agreement were impossible to perform because they could not ensure Pingree's eligibility under the Principal group policy; (3) plaintiffs cannot show a breach because defendants continued to pay the premiums on the Principal group policy; (4) the alleged agreement fails for lack of consideration; (5) Pingree failed to perform under the alleged contract; and (6) based on the shareholder proxy agreement

between Chris Terlip and Kurt Terlip related to the termination of Pingree's employment, Kurt Terlip did

not have authority to enter into an employment contract with Pingree. As to plaintiffs' claim that defendants

breached their fiduciary duties to protect the interests of Pingree and his beneficiaries by ensuring that his

life insurance was in force, defendants argue that they had no fiduciary duty in the circumstances. As to

plaintiffs' retaliatory discharge claim, TTF argues that as a matter of law, no Kansas public policy prevents

shareholders from terminating the employment of directors because of how they vote. Finally, as to

plaintiffs' claim that defendants interfered with the receipt of ERISA benefits, TTF argues that it did not

employ Pingree after September 4, 2001, that he was not eligible for benefits under the Principal policy and

that it therefore could not interfere with the receipt of such benefits.

<u>**Analysis**</u>

**I.      Breach Of Contract Claims**

Plaintiffs allege that TTF and Kurt Terlip breached Kurt Terlip's promise to employ Pingree and

ensure retention of his insurance benefits, company car and credit card. <u>Pretrial Order</u> (Doc. #52) at 6.

A.      <u>Indefiniteness</u>

TTF and Kurt Terlip argue that the alleged contract is void because it is too vague and indefinite

to be enforced. In particular, defendants argue that the record does not disclose the parties to the alleged

contract and their specific promises. <u>See Memorandum Brief In Support Of Defendant, Kurt Terlip's</u>

<u>Motion For Summary Judgment</u> (Doc. #42) at 11. Plaintiffs bear the burden to show the execution and

existence of an employment contract between Pingree and Kurt Terlip or TTF. <u>See Van Brunt v. Jackson</u>,

212 Kan. 621, 623, 512 P.2d 517, 520 (1973). The Kansas Supreme Court has held repeatedly that "[i]n

order to form a binding contract, there must be a meeting of the minds on all essential terms." <u>Albers v.</u>

Nelson, 248 Kan. 575, 580, 809 P.2d 1194, 1198 (1991); see Sidwell Oil & Gas Co., Inc. v. Loyd, 230

Kan. 77, 79, 630 P.2d 1107, 1110 (1981).  To constitute a meeting of the minds there must be a fair

understanding between the parties which normally accompanies mutual consent and the evidence must

show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon

the terms of the contract.  Sidwell, 230 Kan. at 84, 630 P.2d at 1113 (quoting Steele v. Harrison, 220

Kan. 422, 428, 552 P.2d 957, 962 (1976)).  Only reasonable certainty is required in a purported contract,

but where the purported contract is so vague and indefinite that the intentions of the parties cannot be

ascertained, it is unenforceable.  Mohr v. State Bank of Stanley, 244 Kan. 555, 573, 770 P.2d 466, 480

(1989); Richards Aircraft Sales, Inc. v. Vaughn, 203 Kan. 967, 971, 457 P.2d 691, 695 (1969).

      Mrs. Pingree testified that Kurt Terlip promised to continue her husband's life and health insurance

benefits and to let him keep his company car and credit card in exchange for work on accounting and

investments for Kurt Terlip and Bob Terlip. Mrs. Pingree Depo. at 30-31, 35-36, 38, 53, 102, 124, 140.

Mrs. Pingree did not know whether the agreement required her husband to work a specific number of

hours, but she testified that her husband worked several hours a day for Kurt Terlip after September 4,

2001. Id. at 36, 39-40, 55. Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury

could find mutual consent and reasonable definiteness as to the subject matter of the contract, i.e. that in

exchange for life and health insurance benefits and use of the company car and credit card, Pingree would

work as needed on accounting and investments for Kurt Terlip, Bob Terlip and/or TTF.[8]   The Court

therefore overrules defendants' motions for summary judgment on this issue.

> B.    Impossibility Of Performance / Frustration Of Purpose

TTF and Kurt Terlip next argue that as a matter of law, their obligations under the alleged contract

were impossible to perform because they could not ensure that Pingree was insured under the Principal

group policy.  The law has recognized that impossibility or – as stated by more modern authorities –

impracticability of performance may relieve a promisor of liability for breach of contract.  Sunflower Elec.

Co-op., Inc. v. Tomlinson Oil Co., Inc., 7 Kan. App.2d 131, 138, 638 P.2d 963, 969 (1981).  Such

impracticability may arise after the contract, in which case it is referred to as "supervening," or it may exist

at the time of the contract, in which case it is referred to as "original" or "existing."  Id.  The general rule

as to existing impracticability is stated in Restatement (Second) of Contracts § 266 (1981):

> Where, at the time a contract is made, a party's performance under it is impracticable
> without his fault because of a fact of which he has no reason to know and the
> non-existence of which is a basic assumption on which the contract is made, no duty to
> render that performance arises, unless the language or circumstances indicate the contrary.

This statement of the general rule encompasses the exceptions to relief: (1) the impracticability must not

have been caused by the promisor (fault), (2) the promisor must have had no reason to know of the

impracticability (foreseeability); and (3) the language or circumstances may indicate that the promisor not

---

[8]      The evidence is limited with regard to a contract with TTF, but it is sufficient to withstand
defendants' motion for summary judgment.  In particular, Mrs. Pingree and one of her daughters stated that
after Pingree died, Kurt Terlip went to their house and asked for the "Triple T Papers" that Pingree had
been working on for the company.  Declaration Of Pam Pingree Peak ¶ 6, attached to Plaintiffs' Response
(Doc. #56); see Declaration Of Uealene Pingree ¶ 8, attached to Plaintiffs' Response (Doc. #56).
McKnight also testified that based on his conversations with Pingree and Kurt Terlip, he understood that
Pingree continued to work in some capacity for TTF and that it continued to provide him insurance benefits.
McKnight Depo. at 18-20, 36, 55, 73-76, 84.  McKnight told a Principal representative that as a
consultant for TTF, Pingree worked six hours a day and was on call 24 hours a day.  Id. at 65-67.

be relieved because of the impracticability (assumption of the risk).  Sunflower, 7 Kan. App.2d at 138, 638 P.2d at 969.

TTF and Kurt Terlip insist that after Pingree was terminated, they could not make him eligible under the Principal group policy.  Even so, a reasonable jury could find that TTF and Kurt Terlip assumed the risk that Pingree would not be eligible for coverage under the group plan, and agreed to pay premiums on an individual conversion policy from Principal or another company.[9]  See id. (contract may indicate that promisor assumed risk).  Defendants' motions for summary judgment on this issue are overruled.

C.      Substantial Performance

TTF and Kurt Terlip argue that as a matter of law, because they paid the premiums under the Principal policy, plaintiffs cannot show that they breached any alleged contract.  Defendants, however, assume that their only potential obligation under the alleged contract was to ensure the payment of premiums on the group policy.  As explained above, a reasonable jury could also find that TTF or Kurt Terlip agreed that if Pingree was not eligible for coverage under the group plan, TTF or Kurt Terlip would pay premiums on an individual conversion policy from Principal or another company.  Defendants' motions for summary judgment on this issue are overruled.

_____

[9]      Defendants argue that "[p]laintiffs' claim isn't that Kurt should have sought out another policy; rather, it is that Kurt could have seen to it that Gary was covered under the Principal policy."  Kurt Terlip's Memorandum (Doc. #42) at 16.  The pretrial order, however, is not so limited.  Plaintiffs allege that TTF and Kurt Terlip should have ensured that Pingree was eligible under the Principal policy or obtained equivalent insurance.  See Pretrial Order (Doc. #52) at 6 (plaintiffs allege that Kurt Terlip "promised to employ Gary and ensure retention of his benefits, including life, health and dental insurance as well as the company car and credit card"); id. at 33 (disputed issue whether TTF or Kurt Terlip promised Pingree that he would "remain enrolled at TTF's expense for all employee benefits including life, health and dental insurance and that defendants would ensure either these benefits *or other insurance to meet the same benefit levels* enjoyed by Pingree before September 4, 2001") (emphasis added).

- 17 -

D.      Consideration

TTF and Kurt Terlip argue that the alleged contract fails for lack of consideration.  Every legally enforceable contract must be supported by adequate consideration.  See Dugan v. First Nat'l Bank, 227 Kan. 201, 211, 606 P.2d 1009, 1017 (1980); Mitchell v. Miller, 27 Kan. App.2d 666, 672, 8 P.3d 26, 31 (2000).  "Consideration is defined as some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other."  17A Am.Jur.2d, Contracts § 113, p. 129.  A promise is without consideration when it is given by one party to another without anything being bargained for and given in exchange for it.  Varney Bus. Servs., Inc. v. Pottroff, 275 Kan. 20, 32, 59 P.3d 1003 (2002) (citing 2 Corbin on Contracts § 5.20 (rev. ed. 1995)).  Viewing the evidence in a light most favorable to plaintiffs, Pingree agreed to work as needed on accounting and investments for Kurt Terlip, Bob Terlip and/or TTF, which is sufficient consideration for an employment contract.  See id.  The Court therefore overrules defendants' motions for summary judgment on this issue.

E.      Pingree's Failure To Perform

TTF and Kurt Terlip argue that to the extent a jury could find a contract to work on accounting and investments, Pingree failed to perform under the contract.  In particular, defendants argue that (1) plaintiffs have provided no evidence that Pingree worked on any accounting matters and (2) with respect to investments, Pingree attended only two meetings with Kurt Terlip.  Even if the Court accepts defendants' characterization of the record,[10] a reasonable jury could find that Pingree's preparation work and attendance at two meetings with Kurt Terlip was adequate performance under the contract, i.e. to work

_____

[10]      Viewing the evidence in a light most favorable to plaintiffs, Pingree worked several hours a day for TTF or Kurt Terlip after September 4, 2001.

on accounting and investments as needed.  The Court therefore overrules defendants' motions for summary

judgment on this issue.

F.     Kurt Terlip's Authority To Re-Hire Pingree

TTF argues that based on the shareholder proxy agreement between Chris Terlip and Kurt Terlip

which provided that TTF would not re-hire Pingree, Kurt Terlip did not have actual or apparent authority

to re-hire Pingree.[11]

The law recognizes two distinct types of agencies – one actual and the other apparent.  "An

ostensible or apparent agent is one whom the principal has intentionally or by want of ordinary care induced

and permitted third persons to believe to be his agent even though no authority, either express or implied,

has been conferred upon him."  Appeal of Scholastic Book Clubs, Inc., 260 Kan. 528, 538, 920 P.2d

947, 954 (1996) (citing Theis v. duPont, Glore Forgan Inc., 212 Kan. 301, 306, 510 P.2d 1212, 1216

(1973)).  An apparent agent is one who, with or without authority, reasonably appears to third persons to

be authorized to act as the agent of another.  Ford v. Guarantee Abstract & Title Co., 220 Kan. 244, 268,

553 P.2d 254, 272 (1976); Greep v. Bruns, 160 Kan. 48, 55-56, 159 P.2d 803, 808 (1945).

As a matter of law, the shareholder proxy agreement demonstrates that Kurt Terlip did not have

actual authority to re-hire Pingree on behalf of TTF.  A reasonable jury could conclude, however, that

---

[11]     The agreement provided in part as follows:

The parties hereto agree that, except as mutually agreed in writing, Mr. Gary Pingree shall
not be rehired or engaged on or after July 15, 2001, by any business or entity in which
both Chris Terlip and Kurt Terlip own, directly or indirectly, any interest therein. . . .  If
Mr. Pingree has not been terminated by July 15, 2001, then Chris Terlip and Kurt Terlip
hereby grant the other his irrevokable [sic] proxy, as shareholder, officer and director, to
specifically and solely so terminate, effective on or after July 15, 2001, Mr. Gary Pingree
as an officer, director, employee, consultant, contractor and in all other capacities from
Triple T Foods, Inc.

because Pingree did not know of the agreement, Kurt Terlip had apparent authority to re-hire him.  First,

the termination letter which Chris Terlip gave Pingree did not refer to the agreement between Chris Terlip

and Kurt Terlip.  Moreover, Mrs. Pingree stated that her husband showed her what he received from Chris

Terlip on September 4, 2001, and the only paper which he showed her was the termination letter.  A

reasonable jury could therefore conclude that Chris Terlip did not give Pingree a copy of his agreement with

Kurt Terlip and that Pingree did not know about such an agreement.  Absent knowledge of the shareholder

proxy agreement, Pingree could reasonably conclude that Kurt Terlip, as president of TTF, had authority

to re-hire him.  Therefore, the Court overrules TTF's motion for summary judgment on this issue.

**II.**      **Breach Of Fiduciary Duty Claims**

        Plaintiffs allege that TTF and Kurt Terlip breached their fiduciary duties to protect the interests of

Pingree and his beneficiaries by ensuring that his life insurance was in force.  Defendants argue that they are

entitled to summary judgment on this claim because the alleged contract did not create a fiduciary duty and

the law does not imply a fiduciary duty in this context.  A fiduciary relationship may be created by contract,

e.g. attorney/client, or implied from the surrounding facts and circumstances.  See Denison State Bank v.

Madeira, 230 Kan. 684, 691, 230 Kan. 815, 640 P.2d 1235, 1241 (1982).  Plaintiff relies on an implied

fiduciary relationship.

        The existence of an implied fiduciary relationship depends on the facts and circumstances of each

case.  See id.; Rajala v. Allied Corp., 919 F.2d 610, 614 (10th Cir. 1990), cert. denied, 500 U.S. 905

(1991).  Although the Kansas Supreme Court has not specifically defined a fiduciary relationship, it has set

forth certain factors to consider in determining whether a fiduciary relationship exists:

>        A fiduciary relationship impacts a position of peculiar confidence placed by one individual
>        in another.  A fiduciary is a person with a duty to act primarily for the benefit of another.

> A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

Denison, 230 Kan. at 692, 640 P.2d at 1241. All factors need not be present in any particular case. See id. at 693, 640 P.2d at 1241.

A fiduciary relationship cannot be created by accident or inadvertence. See Rajala, 919 F.2d at 614 (citing Wolf v. Brungardt, 215 Kan. 272, 285, 524 P.2d 726, 736 (1974)). Ordinary day-to-day business transactions should not be converted into fiduciary relationships absent an intent to do so. See Denison, 230 Kan. at 696, 640 P.2d at 1243. The Tenth Circuit has emphasized that the "conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law." Rajala, 919 F.2d at 615; see Denison 230 Kan. at 696, 640 P.2d at 1243-44.

Plaintiffs argue that they were particularly vulnerable and that after Chris Terlip removed Pingree from the TTF premises, they had to rely on Kurt Terlip to protect their interests. See Plaintiffs' Response (Doc. #56) at 37; Plaintiffs' Response (Doc. #57) at 38. Plaintiffs have presented no evidence or law, however, which suggests that a fiduciary relationship should be implied in these circumstances. At most, Pingree and TTF and/or Kurt Terlip had an employer-employee relationship which does not create fiduciary obligations on the part of the employer. See Orr v. Heiman, 270 Kan. 109, 117-18, 12 P.3d 387, 392 (2000) (argument that employer has fiduciary obligation to give employee notice of conversion privilege to purchase individual insurance not substantiated by authority and not persuasive). The Court therefore sustains defendants' motion for summary judgment on plaintiff's claim for breach of fiduciary duty.

### III.     Wrongful Discharge Claim Against TTF

Pingree's estate alleges a state law claim against TTF for retaliatory discharge in violation of public policy.  It alleges that TTF terminated Pingree's employment in violation of Kansas public policy which protects directors who exercise their best business judgment in complying with their fiduciary obligations.  See Pretrial Order (Doc. #52) at 15.  Kansas employment law, however, is based on the doctrine of employment at will.  Absent an express or implied contract of fixed duration, or where recognized public policy concerns are raised, employment is terminable at the will of either party.  Frye v. IBP, Inc., 15 F. Supp.2d 1032, 1046 (D. Kan. 1998).  Kansas narrowly recognizes two public policy exceptions to the rule of employment at will: "(1) when an employer discharges an employee for exercising rights under the workers compensation laws and (2) when an employer discharges an employee for a good faith report or threat to report a serious infraction of rules, regulations, or law pertaining to the public health, safety, and the general welfare by a co-worker or employer (whistleblowing)."  Riddle v. Wal-Mart Stores, Inc., 27 Kan. App.2d 79, 85, 998 P.2d 114, 119 (2000).[12]

To prevail on its retaliatory discharge claim, Pingree's estate must demonstrate either (1) that Kansas courts have recognized their retaliatory discharge claims as exceptions to the employment at will doctrine or (2) that Kansas public policy protects the conduct on which their retaliatory discharge claims are based and that they have no alternative state or federal remedy.  See Harris v. Bd. of Pub. Util. of Kan. City, Kan., 757 F. Supp. 1185, 1194 (D. Kan. 1991).  Plaintiff cites no authority which recognizes their

---

[12]     The Kansas Supreme Court has also recognized a public policy exception when an employer discharges an employee for exercising rights under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 et seq.  See Hysten v. Burlington N. Santa Fe Ry. Co., 277 Kan. 551, 85 P.3d 1183 (2004), as modified, No. 90,730, 2004 WL 3142558 (June 1, 2004).  In so holding, the Kansas Supreme Court found that the public policy underlying FELA is identical to the public policy underlying the Kansas Workers Compensation Act.  Id., 277 Kan. at 557, 563-64, 85 P.3d at 1187, 1191.

claims as an exception to the employment at will doctrine. Furthermore, plaintiff has adequate alternative state law remedies for breach of contract. See Lines v. City of Ottawa, Kan., No. 02-2248-KHV, 2003 WL 21402582, at *10 (D. Kan. June 16, 2003) (no state law retaliatory discharge claim had adequate remedy under KAAD); Polson v. Davis, 635 F. Supp. 1130, 1149-50 (D. Kan. 1986) (no public policy exception for sex discrimination and retaliation because of existing alternative remedy), aff'd, 895 F.2d 705 (10th Cir. 1990). The Court therefore sustains TTF's motion for summary judgment on plaintiff's retaliatory discharge claim.

## IV.    Interference With ERISA Benefits Claim

Plaintiffs allege that TTF interfered with the receipt of ERISA benefits by giving Principal inaccurate information regarding Pingree's employment after September 4, 2001. TTF argues that it did not employ Pingree after September 4, 2001, that he was not eligible for benefits under the Principal group policy and that it therefore could not interfere with the receipt of any such benefits. As explained above, viewing the evidence in a light most favorable to plaintiffs, TTF employed Pingree after September 4, 2001. Moreover, a reasonable jury could find that Pingree worked at least 30 hours a week in that capacity.[13] Principal concluded that TTF did not employ Pingree after September 4, 2001, but a reasonable jury could conclude

---

[13]    Declaration Of Pam Pingree Peak ¶ 6 (after Pingree died, Kurt Terlip went to Pingree house and asked for "Triple T Papers" that Pingree had been working on for company), attached to Plaintiffs' Response (Doc. #56); see Declaration Of Uealene Pingree ¶ 8 (same), attached to Plaintiffs' Response (Doc. #56); McKnight Depo. at 18-20, 36, 55, 73-76, 84 (based on conversations with Pingree and Kurt Terlip, McKnight understood that Pingree continued to work for TTF and that it continued to provide him insurance benefits); id. at 65-67 (McKnight told Principal representative that as consultant for TTF, Pingree worked six hours a day and was on call 24 hours a day). In addition, McKnight asked Kurt Terlip about sending a COBRA notice to Pingree, but Kurt Terlip told him to "just hold on" and leave things as they were and that Pingree was still doing consulting work. Finally, Mrs. Pingree testified that after September 4, 2001, her husband worked for Kurt Terlip during the early morning hours at home – sometimes as early as 3:00 a.m., evenings and usually Sundays.

that absent the inaccurate information which TTF provided regarding the employment, Principal would have reached a different conclusion.[14]   Therefore, the Court overrules TTF's motion for summary judgment on plaintiffs' claim for interference with ERISA benefits.

IT IS THEREFORE ORDERED that Kurt Terlip's Motion For Summary Judgment (Doc. #41) filed December 19, 2005 be and hereby is **SUSTAINED in part**.  The Court sustains Kurt Terlip's motion as to plaintiffs' claim for breach of fiduciary duty.  Kurt Terlip's motion is otherwise overruled.

IT IS FURTHER ORDERED that Defendant's, Triple T Foods, Inc., Motion For Partial Summary Judgment (Doc. #43) filed December 19, 2005 be and hereby is **SUSTAINED in part**.  The Court sustains TTF's motion as to plaintiff's claims for breach of fiduciary duty and wrongful discharge. TTF's motion is otherwise overruled.

Plaintiffs' breach of contract claim against TTF and Kurt Terlip and plaintiffs' claims against TTF under ERISA and COBRA remain for trial.

Dated this 11th day of May, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[14]      The Court previously held that substantial evidence supports Principal's conclusion that Pingree was not actively at work for TTF after September 4, 2001.  See Memorandum And Order (Doc. #81) filed April 7, 2006 at 25 (citing Nance v. Sun Life Assur. Co. of Canada, 294 F.3d 1263, 1269 (10th Cir.  2002) (administrator's decision must be upheld if grounded on any reasonable basis; basis need not be only logical one or even best one)).  The Court's ruling, however, does not preclude a jury from finding that absent inaccurate information provided by TTF, Principal would have reached a different conclusion.